IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 09-00214-01-CR-W-GAF |
| SHANNA M. HUTCHENS, | ) ) ) | |
| Defendant. | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

### I. INTRODUCTION

Sentencing is scheduled for November 9, 2010, at 1:30 p.m., before United States District Court Judge Gary A. Fenner. As more fully explained below, the Government recommends that the Court vary upwards from the advisory Guidelines range of 37-46 months, and sentence Ms. Hutchens to at least 60 months' imprisonment, waive imposition of a fine, enter a mandatory restitution order of $818,987.96 as a condition of supervised release, and enter an order imposing a $200.00 special assessment.

The defendant's plea agreement requires payment of the $200.00 special assessment at time of sentencing. The defendant's failure to make this payment would constitute a breach of the plea agreement, in which case the United States reserves the right to be released from its obligations under the plea agreement. In accordance with the plea agreement which allows either party to request a variance from the advisory Guidelines range, the United States will request an upward variance, based upon Ms. Hutchens' criminal history and the actions she has taken since committing the crimes which illustrate her lack of remorse and willingness to atone for her

wrongdoing, in that she has continued to commit financial crimes and has extravagantly spent stolen proceeds, depriving the victims of restitution to which they are lawfully entitled.

## II. FACTUAL BACKGROUND

As noted in paragraph 40 of the Presentence Investigation Report (PSR), Ms. Hutchens forged a series of checks in 2003 for which she was prosecuted in Jackson County, Missouri. She admitted her crimes to police, and said one of her motives for committing the offenses was that her husband had been laid off from work and they had financial troubles. She pled guilty to three counts of forgery in Jackson County on July 14, 2004, and was placed on probation, with a suspended imposition of sentence.

In 2004, Tommy Hutchens, Shanna Hutchens' husband, lost his job with Consolidated Freightways, and Shanna Hutchens wanted a flexible, part-time job that would enable her to spend time with her children. Ron and Dianna Richardson, the owners of Richardson Hauling, Inc., ("RHI") took pity on them and hired them. The Richardsons hired Tommy Hutchens as a driver in 2003, and hired Shanna Hutchens as a part-time bookkeeper in approximately May 2004. (PSR, ¶ 66.) The Richardsons let Shanna structure her hours so that she could be home with her children when they were out of school. Further, the Richardsons provided financing for a 2003 Chevrolet Silverado HD 2500 4x4 Tommy Hutchens was buying from them, because the Hutchens had been through a bankruptcy and thus could not get a loan.

Ms. Hutchens repaid the Richardsons' kindness by coolly and systematically looting their business over the next several years. She started stealing from them in the fall of 2004 - soon after beginning her new job and very soon after being placed on probation for forgery. She embezzled from RHI by creating checks made out to 'Hutch Trucking,' or 'Tommy or Shanna

Hutchens,' among other variations, and then forging either Ron or Dianna Richardson's name on the checks. These checks were then cashed, converted into cashiers' checks, or deposited into one of the Hutchens' bank accounts. The fraudulent, forged checks were often for the same amount as the legitimate paychecks. So, for example, there was a valid, legitimate check for $2,931.67 issued to Hutch Trucking for work the week of February 26, 2006, which showed "2-26-06" in the memo section of the check. This check was signed by Ron Richardson. An additional four checks for the exact same amount, $2,931.67, were also made out to Hutch Trucking, and all had "2-26-06" in the memo section of the check. The Government contends that these additional four checks are fraudulent. Ms. Hutchens contends that one of the additional checks for the amount $2,931.67 is valid, as it was for work completed. This dispute between the parties over the loss amount is discussed further below.

She continued and even increased her thefts over the years until she had taken over $820,000 from the Richardsons. As the Richardsons employed both Ms. Hutchens and her husband, she did not have the excuse that she had used before - that her husband had been laid off and they were having financial troubles. Her only motive was her desire to live well above her legitimate income.

With the money embezzled from the Richardsons, the Hutchens:

    A) bought a bigger house, for $255,386.01, on August 14, 2007. The contract price and loan amount was $218,955, however, the Hutchens paid for $36,431.01 in upgrades outside of closing;[1]

    B) paid approximately $30,000 for professional interior decoration of their bigger house;

---

[1] This house has since been foreclosed, presumably since the stream of illegitimate income to pay for it has been stopped.

C) bought or leased at least twenty automotive/water vehicles - sixteen during the embezzlement and four after being caught (the Hutchens did not own all these vehicles at the same time - several were traded in when they bought subsequent vehicles);

1) 2003 Chevrolet Silverado HD 2055 4x4 on September 15, 2004, for $30,000;

2) 2005 Harley Davidson Night Train FXSTB Motorcycle on August 6, 2005;

3) 2003 Ford Expedition on November 14, 2005, for $27,251;

4) 2006 Ford Expedition on May 22, 2006, for $35,669;

5) 2006 Dodge Charger RT on November 27, 2006, for $32,570;

6) 2004 Ford Excursion on March 3, 2007, for $23,617;

7) 1999 Pontiac Firebird on March 26, 2007, for $9,320;

8) 2006 Seadoo GTX-LTD 186 on May 21, 2007;

9) 1997 Ford Tandem Dump Truck on August 30, 2007 (leased);

10) 2003 Sterling 9511 Dump Truck with Barrel Bed on August 30, 2007, for $25,900 (leased);

11) 2005 GMC Yukon Denali XL on November 15, 2007, for $32,390.60;

12) 1999 Advantage Trailer on December 20, 2007 (leased);

13) 2006 Dodge Charger SRT-8 on March 10, 2008, for $33,178;

14) 2005 Chevrolet Cobalt SS on May 30, 2008, for $13,500;

15) 2004 Crownline 22 foot, 225 Boat on June 11, 2008, for $29,000;

16) 2004 Ford F-250 Super Duty Diesel 4x4 Pickup Truck, in October 2008 (leased);

17) 2004 Chevrolet Monte Carlo on November 24, 2008;

18) 2006 Peterbilt Tri-axle Dump Truck on May 27, 2009 (leased);

4

19) 1999 Ford Pickup Truck on December 1, 2009;

20) 2000 Chevrolet Blazer on March 10, 2010, for $3,000;

D) bought two beauty shops;

E) paid for two cruises for themselves and other family members - paid $15,283 for a Christmas 2007 cruise to All World Travel;

F) bought six Chiefs' season tickets;

G) paid for a personal trainer for Shanna Hutchens;

H) paid for multiple trips to Las Vegas; and

I) rented a lake house in Warsaw, Missouri, for at least $500 per month.

The Richardsons discovered the embezzlement in late October 2008, and confronted Ms. Hutchens on October 27, 2008. At that point she confessed, although she said she did not know how much she had embezzled. (PSR, ¶ 11.)

### III. POST-OFFENSE CONDUCT

After being caught in the fall of 2008, Ms. Hutchens cried and promised to pay restitution, however, as of the date of the sentencing memo, she has not paid a dime. (PSR ¶¶ 11, 17, 21.) In the fall of 2008, Tommy Hutchens turned over to RHI three checks which had been issued to him, totaling $5,406.06, which is the first, last, and only money that has been paid in restitution to the Richardsons. In fact, Shanna Hutchens continued to extravagantly spend defendant's embezzled proceeds <u>after</u> she was charged in federal court:

A) bought her 16-year old son a Chevrolet Blazer in 2010;

B) paid for professionals to install Christmas lights on her house in 2008 - 2009;

C) paid for a family cruise to the Bahamas in January 2010;

D) continued to make payments on a 22-foot boat throughout 2010; and

5) continued to pay $500/month rent on a lake house in 2010.

While the Hutchens have sold numerous vehicles and appliances on Craigslist and eBay in 2009 and 2010, they have used that money for themselves rather than for restitution.

Even worse than Ms. Hutchens' continued spending of her stolen proceeds in disregard of restitution, is her commission of new financial crimes since being caught embezzling from the Richardsons. As noted in the PSR, Ms. Hutchens is charged in Jackson County with passing a bad check with purpose to defraud. (PSR, ¶ 43.) Attached to this sentencing memorandum and labeled as Exhibit 'A' is a letter from the victims of that bad check, Debi Clark and Shannon Martin, owners of The Yellow Strawberry, recounting the crime and the impact it has had on their business. Significantly, Ms. Clark and Ms. Martin note that Ms. Hutchens wrote the first bad check on November 17, 2008, to pay for decoration of the hair salon she had bought with embezzled proceeds. Ms. Hutchens then covered that bad check with another bad check made out to The Yellow Strawberry for $3,000, on December 1, 2008, soon after being confronted with her RHI embezzling scheme and after she promised to make restitution. Ms. Clark and Ms. Martin recount Ms. Hutchens' lack of remorse and continued spending after writing them a bad check. Their letter describes the impact of Ms. Hutchens' crimes: "[i]t is very offensive to be a financial victim of someone who has no regard for morality, honesty, or the judicial system."

Also attached to this sentencing memorandum as Exhibit 'B' is a letter from Debbie Williams, owner of Burland Investments. Ms. Williams entered into a contract to sell her hair salon to Ms. Hutchens in October 2008. In her letter, Ms. Williams catalogs the financial damage Ms. Hutchens caused in the four months she had the salon before Ms. Williams had to

resume control because paychecks were bouncing. Even though the salon grossed approximately $99,000 during the four-month period Ms. Hutchens had control, Ms. Hutchens left unpaid utility bills, $7,000 in unredeemed gift cards on the books, leased furniture she had not paid for, and a new sign which wasn't paid for. Ms. Williams states in her letter, "Shanna pulled as much money and value as possible out of the salon in the short period she had possession." Ms. Hutchens paid $4,000 in restitution, so this case was not prosecuted.

### III.  SENTENCING RECOMMENDATION

**A.  Guideline Disputes**

There are unresolved guideline disputes. Pursuant to the PSR the total offense level is 20. The defendant's criminal history category is II, so the advisory Guidelines sentencing range is 37-46 months' imprisonment. (PSR, ¶ 82.)

**1.  Loss Amount**

The loss amount of $824,394.02 involving 242 fraudulent checks is supported in at least four separate ways. First, all of the fraudulent checks have forged signatures of one of the owners - either Ron Richardson or Dianna Richardson. Both Ron and Dianna Richardson will testify at sentencing that they did not give signature permission to Ms. Hutchens.

Second, RHI used QuickBooks accounting system. Analysis of RHI QuickBooks in 2010 showed that none of the fraudulent, forged checks were in the RHI system. Of the 242 fraudulent checks, 11 were located in the Voided and Deleted Transactions Detail, because Ms. Hutchens had deleted the checks from the system. 231 of the fraudulent checks did not appear in the system at all, and thus were likely not created on the RHI computer system. If the checks were

7

actually legitimate, there would have been no incentive for anyone to delete them, nor to create them outside of the RHI QuickBooks system.

The third way to determine the fraudulent checks is by the date. RHI always paid their contractors on a Monday. They paid their W-2 employees on Fridays. Thomas Hutchens worked for RHI as both a contractor and a W-2 employee, however, all of his employee checks were valid. Only his contractor checks were fraudulent and forged. As noted above, many of the forged, fraudulent checks were issued for the same week of work. It would make no sense for RHI to issue two checks to the same contractor, for the exact same amount, for the same week of work as shown in the memo. And yet Ms. Hutchens claims that this is exactly what happened - that RHI issued two legitimate checks to Hutch Trucking for the exact same amount, for the same week of work, one of which was signed by the owner and the other which was forged. In one really prolific week of embezzlement, Ms. Hutchens created eight fraudulent checks, to match the one valid check issued that week. (She and her husband bought a new house in August 2007.) All the dates on the checks were July 23, 2007, all were issued in the amount of $5,653.00, and all showed "7-15-07" in the memo section of the check. While Ms. Hutchens admits four of the eight checks were fraudulent, she claims that one of the forged checks was valid, even though it written on the same date, for the exact same amount, and for the same week of work as the valid check. Her claim is not plausible. The absurdity of her claim is well illustrated in a spreadsheet prepared by Financial Analyst Scott Hamann, U.S. Attorney's Office, which shows all the checks made out to Hutch Trucking by RHI. The spreadsheet, attached to this sentencing memo as Exhibit 'C,' shows the valid checks, the checks which the Government claims are fraudulent, the checks which Ms. Hutchens admits are fraudulent (listed on the

8

spreadsheet as "Admitted"), and the checks which are in dispute - that is, the checks the Government claims are fraudulent but that Ms. Hutchens claims are valid. Ms. Hutchens has categorized checks in dispute in two ways: 1) for supposedly valid work (listed on the spreadsheet as "TH work per SH"); or 2) supposedly approved by Ron Richardson (listed on the spreadsheet as "Approved by RR per SH"). At the time of writing this memo, undersigned counsel does not know why Ms. Hutchens claims Ron Richardson approved checks made out to Hutch Trucking which were not for legitimate work, but Ron Richardson will testify at sentencing that he did not approve these checks. There is a final category - checks that were discovered to be fraudulent after defendant pled guilty, and investigators were going through the records to document the Government's loss amount - those checks are listed on the spreadsheet as "Add to SH."

The fourth way that this Court can confirm the checks were fraudulent is by the 1099 statements submitted to the IRS. RHI has every incentive to fully and accurately report money paid to its contractors, as those are business expenses which are not taxed. If RHI really did pay Hutch Trucking an additional $501,166.38 for valid work as claimed by Ms. Hutchens, it would have reported those payments on the 1099 forms. RHI did not report the forged checks on the 1099 forms, and in fact, paid taxes at a higher rate than they should have - the Richardsons will testify that they are planning to file amended tax returns to reflect the embezzlement.

Even just one of these methods of proof supports the Government's loss amount by a preponderance of the evidence - the four together prove it beyond all doubt.

9

## 2. Abuse of Trust Enhancement

The defendant objects to imposition of this enhancement, arguing that as the bookkeeper for Richardson Hauling she was one of several employees, was not a manager, and was not responsible for reconciling the books of RHI. (PSR Adden, page 3.)

But the defendant's position allowed her to commit and conceal her offenses for an extended period of time - several years, in fact. As Probation Officer Heilman notes in the PSR Addendum response, Ms. Hutchens was responsible for creating payroll, and she had access to the company's QuickBooks computer program. Ms. Hutchens deleted her forged checks from the company's QuickBooks, which significantly facilitated the concealment of her embezzlement. While she was one of several employees at RHI, she alone had primary responsibility for payroll and accounting.

Ms. Hutchens also qualifies for the enhancement because by forging the owners' names to the checks, she exceeded and abused her authority. Pursuant to Application Note 2 for §3B1.3, "[n]otwithstanding Application Note 1, or any other provision of this guideline, an adjustment under this guideline shall apply to the following: (B) A defendant who exceeds or abuses the authority of his or her position in order to obtain, transfer, or issue unlawfully, or use without authority, any means of identification. "Means of identification" has the meaning given that term in 18 U.S.C. § 1028(d)(7)." U.S.S.G. § 3B1.3, comment, (n.2 (B)). The first means of identification listed in 18 U.S.C. § 1028(d)(7) is name. Title 18 U.S.C. § 1028(d)(7). Ms. Hutchens used and signed the names of the owners on the fraudulent checks she made out to herself and her husband, so regardless whether she otherwise meets the definition for an abuse of trust, she qualifies for the enhancement pursuant to Application Note 2(B). Ms. Hutchens abused

the trust (misplaced as it was) that the Richardsons placed in her for many years and was not caught until she had stolen so much that their business got into trouble; her objection should be overruled and the abuse of trust enhancement applied.

**B.     Recommended Sentence of Imprisonment and Supervised Release**

The plea agreement allows both parties to seek either a departure or a variance from the advisory Guidelines range.  (Plea Agreement, docket entry 17, at ¶ 10, pages 7-9.)  Based on the sentencing factors set forth in 18 U.S.C. § 3553(a), the United States recommends that the court impose a prison sentence of at least 60 months, followed by 3 years of supervised release, and mandatory restitution.

        **1.     The History and Characteristics of the Defendant**

If the Court finds that the defendant's Criminal History Category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes, the Court may depart upward from the Guidelines pursuant to U.S.S.G. § 4A1.3.  The Government believes that is the case with Ms. Hutchens.

Although the defendant may present letters and/or testimony from supportive friends and/or family members which no doubt will state that they love her and that she is 'otherwise' a good person, that does not change the fact that for no reason other than greed, she stole more than $800,000 from employers that trusted her.  (PSR, ¶ 13.)    The Richardsons hired defendant while her state charges for forgery were pending, and the ink was barely dry on her probation papers when she started committing the exact same crime against the Richardsons - this was how she repaid them for their kindness in hiring both she and her husband after her husband had lost his job.  (PSR, ¶ 19.)  That this crime went on, uninterrupted, for years, and in fact, increased in

11

severity over the years, (PSR, ¶ 12.) demonstrates that defendant's conduct was not aberrant behavior for her.

The Government also seeks an upward departure/variance because the defendant's Criminal History Category does not adequately reflect the likelihood that she will commit other crimes, and because her conduct since being caught shows a complete lack of remorse and willingness to atone for her crimes, which indicates an increased risk of recidivism.

The Government contends that Criminal History Category II does not reflect the likelihood that Ms. Hutchens will commit other crimes because: 1) Ms. Hutchens began forging checks almost immediately after being placed on felony probation for forging checks, thus committing the exact same crime, but on a much larger scale; 2) her performance on probation was poor, (PSR, ¶ 40) and in fact, the probable reason she was discharged from probation without facing revocation for her violations was that she paid restitution on the state case, no doubt using money she embezzled from the Richardsons; and 3) she continued to commit financial crimes after she was caught embezzling hundreds of thousands of dollars from her employer - she wrote a bad check to the Yellow Strawberry and left a series of bad debts with Debbie Williams, the owner of the beauty salons the defendant was purchasing. (PSR, ¶ 43.) Ms. Hutchens received no criminal history points for writing the bad check, as she has sought and received continuances on her pending case in Jackson County, nor did she receive any criminal history points for the financial loss she caused to Debbie Williams. Because the criminal justice system has seemingly failed to impact Ms. Hutchens in any way, and because her proclivity for committing financial crimes is greater than her three criminal history points

reflects, the Government will request that the Court adjust defendant's Criminal History Category upward, pursuant to U.S.S.G. § 4A1.3.

      **2.**      **The Nature and Circumstances of the Offense**

Ms. Hutchens stole more than $800,000 from owners of a small business whose biggest mistakes were hiring her and her husband, and then trusting them. She did so in order to live far above her legitimate income, which was around $11,000 per year (18 hours a week at $12 per hour). In doing so, she betrayed their trust and friendship. Although she pled guilty, she doesn't fully acknowledge the harm she did to RHI, by claiming forged checks were legitimate or somehow 'authorized.' And she stole from the Richardsons such a large amount that the company became unable to pay employees and was bouncing checks. (PSR, ¶ 18.) Even as the 'bookkeeper' for the company, she forged checks intended for her own bank account that bounced. The money laundering counts in the indictment illustrate a small sample of the extravagant spending Ms. Hutchens and her husband engaged in as a result of the embezzlement. They paid for three vehicles, two of them in full, over a period of approximately eighteen months. (Counts Two-Four of the indictment.)

The extent of Hutchens' embezzlement, and its continuing, increasing scope, committed while she was on probation for the exact same conduct, combined with her continued spending of stolen proceeds since being caught, supports a sentence above the Guidelines range.

      **3.**      **The Need to Afford Adequate Deterrence to Criminal Conduct**

Defendant committed prolonged, serious crimes that greatly harmed a small business in the Kansas City area. As noted above, she did it out of greed, so that she could live above her income, but she also appeared to want to inflict maximum damage on the victims, Ron and

Dianna Richardson. Of course, while committing this crime, defendant must have thought she wouldn't be caught, and that even if she was caught, she would escape serious punishment as she had before in Jackson County, where she got an SIS probation and faced no revocation despite violating the terms of her probation. (PSR, ¶ 40.) She will no doubt claim that she can better pay restitution with a lower sentence - however despite telling the Richardsons that she would pay them back two years ago, she has paid nothing. Her empty promise to make restitution is nothing more than attempted manipulation of the system.

Defendant and other potential white collar criminals should know that if they commit a crime and get caught, they will not escape with an insincere apology and a slap on the wrist in the form of probation or minimal prison sentence. This case is known to many people in the greater Kansas City trucking and hauling community, and in eastern Jackson County, and the Government believes there would be deterrent value in Ms. Hutchens being sentenced to a significant prison term, and thus held fully accountable for her crimes. The Government believes an upward departure from the advisory Guidelines range is necessary in order to adequately deter this defendant and others.

4. **The Need to Protect the Public from Further Crimes of the Defendant**

A probationary sentence for defendant's three counts of forgery did not protect the public from further crimes of the defendant. Being confronted with the embezzlement of hundreds of thousands of dollars from her employer did not protect the public from further crimes of the defendant, despite her apology and empty promise to make restitution. Being charged in federal court with bank fraud and money laundering did not protect the public from further crimes of the

defendant. Only a very significant prison sentence will protect the public from this defendant's further crimes.

**C.      Recommended Sentence for Monetary Penalties**

    **1.      Restitution**

The defendant's crimes created a financial loss to Richardson Trucking Company; thus the United States seeks imposition of a mandatory restitution order under the Mandatory Victim Restitution Act, 18 U.S.C. § 3663A, in the amount of $818,987.96. (PSR ¶ 91.) The Government recommends that the Court impose this as a condition of supervised release.

    **2.      Fine**

In light of the defendant's financial situation and the need for financial restitution to the victims, the United States does not object to the Court waiving imposition of a fine.

    **3.      Special Assessment**

Because the defendant was convicted of two counts, imposition of a $200.00 special assessment is required. The defendant's plea agreement requires payment of the $200.00 special assessment at the time of sentencing.

## IV.  CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court sentence the defendant to at least 60 months' imprisonment, 3 years' supervised release, and order her to pay restitution.

        Respectfully Submitted,

        Beth Phillips
        United States Attorney

By    */s/ Kathleen D. Mahoney*

        Kathleen D. Mahoney #38828
        Assistant United States Attorney
        Charles Evans Whittaker Courthouse
        400 East 9th Street, Fifth Floor
        Kansas City, Missouri 64106
        (816) 426-3122

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing was delivered on November 3, 2010, to the CM-ECF system of the United States District Court for the Western District of Missouri for electronic delivery to all counsel of record.

        */s/ Kathleen D. Mahoney*
        Kathleen D. Mahoney
        Assistant United States Attorney